1-0 and hear from Ms. Kline. May it please the Court, Honorable Mr. LaFond. Good morning, ladies and gentlemen. I'm here representing Dr. Alexander Edionwe, who was a professor at the University of Texas, Pan American, in the Rio Grande Valley, and we're here on an appeal of a dismissal on the pleadings under Rule 12, 12c, and also a denial of the motion for leave to amend the pleadings before and after judgment. The Court also denied the motion to alter or amend the judgment after she entered judgment. We contend that the dismissal on the pleadings was error for a number of reasons. Appellant was a tenured professor at University of Texas at Pan American. He had been employed there over 20 years. He had been tenured over 14 years at the time of the merger. One of the fundamental issues in this case is that appellees continue to discuss this matter as if University of Texas, Pan American, like some other universities, went broke and went out of existence. This is not the case. We've cited two references in the legislative history from Senator Chuy Hinojosa, Juan Hinojosa, and Senator Judith Zaffirini that were the legislative history pertaining to Senate Bill 24, and at all times they referred to mergers of two institutions, a merger of University of Texas, Pan American, and a merger of University of Texas, Brownsville. Why that detail is important is because of Appellee's briefing where we contend that he confuses abandonment of a program because he contends that Dr. Idionwe abandoned his position and the case law that we've cited in our brief talks about abandonment of a program by the university. At no time did Dr. Idionwe abandon his position, nor is that what the case law talks about. So that the merger was designed to increase access to funding and also to allow them to have access to the permanent university funding. Pan American no longer exists, does it? It's now University of Texas at Rio Grande Valley. Does it no longer exist? In some form, the university was terminated. A lot of the email addresses still exist, but the term, but the university itself has been terminated, as was University of Texas, Brownsville, by merger. And what is missing from the Appellee's briefing is that he refers to the frequently asked questions bulletin that was, that was issued in July of 2014. But nowhere in his briefing does he talk about the hiring of tenured and tenured track faculty members, which is the, the issue that was, came out of a two-day meeting of the Board of Regents in May of 2014. And it appears in the record beginning at 155, I'm sorry, at 156. I'm wrong again, it's 146. And in the hiring of tenured and tenured track faculty members notice, it stated that individuals who held a terminal degree and were full-time tenured faculty members would be moved into tenured positions or tenured track positions in the new university. If, if they file, timely file the necessary form. I disagree, Your Honor, because that is not contained within the May 14, May 15 bulletin. You're talking about the July 18 frequently asked questions bulletin, which was issued when our client was in Nigeria. And I think that the Court is confused by the Appellee's briefing, which voluntarily chooses to ignore the hiring of tenured, of tenured track bulletin, which was issued in May of 2014 after a two-day meeting of the Board of Regents. And it contains a guarantee of employment for all tenured and tenured track employees in the new university. Well, what about, what about the, the statement that the, in the legislation instructing the Board of Regents to, quote, facilitate the employment at the new university of as many faculty and staff as is prudent and practical? We contend that that also creates a property interest in Dr. Prudent and practical? Prudent and practical, yes, because they followed that. What happened was that the Board of Regents said, you're going to do whatever is prudent and practical. They left it, I mean, the legislature did. They left it to the Board of Regents to pass the enabling legislation. And under the case law in Texas, the Board of Regents' rules are the equivalent of case law. And so what the Board of Regents did in their, in their hiring policies, they said, if you are tenured track and you are tenured, as soon as the President makes a recommendation on hiring, all of you will go into the new university as tenured track. And also, that's pointed out by the fact that they considered all of the prior years for calculating the number of years of service. However, let me just ask you a practical question, because Mr. Idiyanwe goes off to Nigeria, and he, he must be aware that the consolidated university was about, was planning to have a seamless operation such that all the students would start their classes in the fall. He doesn't show up until October, right? No, that's, that's incorrect. Well, it said he didn't come back until October. I believe that's a misstatement. What he, it says that he applied in October. He contacted them in October. He, he, he was gone for a four-week period. But the issue is that they said that if you are qualified as a tenured employee or a tenured track employee, you will be invited to apply. He never received an invitation. He never received an email. So he waits until October after, you know, which, at the time, at which time the new session is, has probably been going for nearly six weeks. Well, he contacted the university on, and on October the 4th, but this is an interesting issue, because there are no facts that have been developed about when it was that he contacted the university. And so that our petition has to be taken as true. But this is why dismissal on the pleadings is an incorrect remedy, because under the law in the Eastern District of Texas in the Third Circuit and the Seventh Circuit, the, the question of protected property interest is a fact question. It is not a question of law. And we've been deprived of our opportunity to show facts such as that, Judge Jones. And also, on October 7th, he was told that he could go ahead and, and apply in Phase 2. But on October 7th, when he contacted them, Phase 1 was not complete. Phase 1 hiring was still under, under consideration. But he didn't timely apply during Phase 1. You say that he wasn't notified. You say he wasn't invited. Will you represent seven people who have filed suit against the, against the university? But not on notice issues. Were they, were they specially notified, other than the, the frequently asked questions being posted on, I presume, the website, which I presume you could, your client could have accessed in Nigeria? Those are the kind of fact questions that need to be developed in the evidence, which is why we're entitled to a reversal. Well, you have the facts. You know you filed the other pleadings for the other six. Yes, and I believe that there are communications with other faculty members that he did not receive. And that will be our position. But notification can be the form of the, the frequently asked questions being posted on the website, correct? But notification requires, notification is a constitutional question. And the constitutional question requires that the, he be given individual notice and that he be given an opportunity to comply. He also was not even granted a hearing on whether or not his termination, his non-hiring, his failure to continue in employment, complied with the rules. He didn't even get a hearing. And so, in, in July 18- Did the other claimants that you filed suit on behalf, did they have a special notification or were they invited or did, was it just the university sending out something on the website? I'm asking you. As I said before, I believe there were additional communications between the other faculty members and the university that he did not receive. But the issue is that in July of 2014- Would that have happened after they filed their papers, timely, to be considered? I cannot answer that question today. I can't, I can't go through the facts of the other six, six cases today as I stand here. I'm asking you about your client. Is he different than the other people? Because you're, you're indicating he wasn't notified. Well, not all of the- And he wasn't invited. Was anyone specially notified or invited? I believe there were communications to individual faculty members that he did not receive. But my position is that he is entitled under the U.S. Constitution to individual notice because his protected property interest is being deprived because of the fact that he was denied employment. And when we got to court, the Court never even granted a scheduling order. What's the property interest?  I'm happy to talk about that. He was tenured at a university that was dissolved. He no longer had a tenured position.  And rule 31008 of the Texas Regent Rule says that you count those years, but not from an outside jurisdiction or not from an outside institution. If they thought that UTPA was an outside institution, meaning separate from UTRGV, then they would not have counted those years on tenure, which they did. Then also, tenure requires that you only be fired for cause or financial exigency. And the appellees have claimed that this was a discretionary benefit. It was not under the May 14, May 15 policies and also under the Senate Bill 24. All we have to show is that he had a reasonable expectation of continued employment, which he had by his length of service, the fact that the legislature said to hire everyone that was practical and prudent, the fact that the hiring policy, which was the 1,120 minutes of the board, said that tenure and tenure-track members would be appointed, that it has, under James v. Wall in Texas, that the Regents' rules have the force of law and creates a State-created right. So under James v. Wall, the May 14, May 15 Regents' minutes created a right that is the force of law. Also, the public statements about it being a merger, even the frequently asked questions talked about the hiring criteria that he complied with. He had not been disqualified for disciplinary reasons. We know all that. I mean, we take as a given that the fellow was in perfectly good standing at Pan American. But isn't there something here that, I mean, the State cites it, and maybe it's a leading, whether it's in the Senate bill or not, plan made clear that, quote, faculty appointments and tenure at UTB and UTPA, quote, will terminate, close quote, when, quote, UTB and UTPA respectively are abolished, close quote. Don't disagree with that. That was the idea for payroll and for issuing new checks as to what time. It says tenure will be terminated. Because they were guaranteed under the hiring policy and also under the draft conclusion, but under the hiring of tenured and tenured faculty members, it says that the President shall recommend the Board of Regents grant tenure to any individual who holds a terminal degree and holds a full-time tenured faculty appointment as a professor, associate professor, or assistant professor on the date of the recommendation. It doesn't say subject to a timely filing. It doesn't say subject to anything else. It says that the President will recommend that all the tenured, and why is it then that Dr. Bailey made such a statement about, well, 97% of our faculty went with us? 97% of the faculty and staff went with us? Why would that not create an expectation that was validated? Well, you know, the university has to create, that's the entity that has to create the expectation. Absolutely. I mean, individual, you know, deans or faculty members can't create that. Dr. Bailey is the President of the university who stated after the fact that they took 97% of the faculty and staff, but what I'm talking about is the Board of Regents, which has the effective state law that says that the tenured and tenured faculty will be taken, and it frequently asked questions says eligible faculty members who meet criteria, meaning you haven't been disciplined, will automatically receive a tenured position. If you're eligible, you will automatically receive a tenured position. And so the only bulletin that had been published when Dr. Idionwe went to Nigeria was the one that said you're going to be invited because you have a tenured position. And the Hennigan case and the Yates case say that whether you have a property right in terms of continued employment should not be decided on the pleadings. Did you allege a date that your client notified the new university that he was interested in a position? Absolutely. He did. He contacted them. No, no. Did you allege a date? The date? Yes. Well, I alleged a date specific that he talked to them that they told him you need to wait to Phase II. I'm not certain that the pleading contained the date that he originally talked to anybody. I mean, this was a telephone conversation or what? I believe so. And that's what we were hoping to file an amended pleading, and the Court would not allow us to file an amended pleading. Remember that this case was filed in State court, which is a fair notice standard. And we asked for permission to file a new pleading, and she denied it. And then we asked after she entered judgment to amend the pleading, and we attached the pleading that we would have filed to the motion, and she denied it again. So on the issue of protected property interest, there's a multitude of layers that are not unilateral. Remember that the test is, is it a unilateral expectation or has the entity given you the right? No, but again, I mean, even if he had some expectation based on this Phase I, he did not apply timely. That was not contained within the requirements of Senate Bill 24 or the May 14, May 15 amendments. But it was in the, yes, but you're not relying on Senate Bill 24. You're relying on some Board of Regents thing that you, and, and some other communication by the President that everybody was going to get rehired, but they had the discretion under that bill to promulgate the guidelines for rehiring. But having promulgated them, they have to stick by them. Yeah, and one of them was . . . That's where the due process argument comes from, that we've been denied the opportunity to make. All right. Thank you. Thank you. Thank you. You have the chance for rebuttal. All right. Mr. LaFond. You know, you are, this does strike one as a little bit arbitrary. May it please the Court. Your Honor, I don't believe that it, that it was arbitrary. The, the, the legislature went through the process of, of considering how to create University of Texas Rio, Rio Grande Valley, and it, and it decided after debate to give, to give discretion to the Board of Regents with regard to hiring. And with regard to that hiring, I'd like to, if I may, first begin by correcting a misstatement made, in fact, by my colleague. First, my colleague's argued that the, that the hiring criteria issued by the Board of Regents have the force of law. Now, on page 9 of her reply brief, she responds to our, our citation of, of the hiring criteria by saying, just because the hiring criteria say it, doesn't make it so. She, she concedes, in fact, that it's not law. But even, even if it were law, we can start with, it says, the President of UTGRB shall recommend to the Board of Regents that tenure be granted. That's not a guarantee. What are you citing? I am citing the hiring criteria at ROA 146. And what's the, okay, dated when? Dated, this is from the May meeting. It says meeting of the UT System Board of Regents Academic Affairs Committee. The May, okay. Yeah. This is, this is the document that, that counsel was, was referring to. And in, in Staheli and, and in Whiting, this Court said that if there's discretion at the end of the line, then there's no guarantee. And here, there's discretion at the end of the line. The only thing that this guarantees is that, is that the President will recommend tenure.  I think there was, oh, go ahead, excuse me. Sorry. And then counsel read you, it said tenure shall be recommended if, and then there are several things below that. Counsel read the first one. The second one is the individual timely completes and submits all forms required by UTGRB to express the individual's interest and qualifications for a tenured faculty appointment at UTGRB. That's the only default, right? I'm sorry? That is the only default of Professor Edionway that's on the record. Sure. And that's, that's correct, Your Honor. And, and as the FAQ says, the FAQ says these are a lot of qualifications. What if I meet all but one? And it says that you will not be allowed to apply during Phase I. But, and. Let me ask you this. Was this, was his position abolished? Yes, it was, Your Honor. I mean, what does the timeliness have to do with it if the position's abolished? Well, that's, I mean, we can, we can, we can start back there. The, the, the timeliness puts the car before the horse here because there was no property right in employment at, at UTGRB. The Board of Regents Rule 31007, which is cited at ROA 96 and at Appellants Brief 15, says that tenure applies to an institution. And as this Court has held, tenure in the UT system applies only to the component institution that employs the faculty. And the legislature presumably knew this. And they, and they abolished UTPA and created UTGRB. They didn't just, they didn't just say abolished. They statutorily repealed the authority for UTPA. UTPA, the component institution, was abolished. All of its academic programs and, and positions were, were abandoned. And so when, when Dr. Idiyamwe says that he has, has a position at UTGRB, he no more has a position there than he does at UT Austin. The, the tenure attached only to UTPA. And when UTPA ceased to exist, so did his, his tenure. He received everything that was due him for his property right in tenure at, at UTPA. But no, no one was hired to take the position that, that the plaintiff had prior to the abolition of that university. Is that right? Yes. He, he had, he had a specific property right in tenure at UTPA prior to its abolition. What was his job? His job was a professor in the dietetics program. I mean, didn't he have a specific position other than that? I'm, I'm not sure, Your Honor. I think that, that was his, his tenure, tenure position at UTPA. I thought his, his particular job or what he taught was, was terminated when the new, new university was created. Oh, no. So if you're, if you're speaking about that, his, his, his position was not filled. I don't know if you qualify that as, as terminated or not, but the position that he, that he applied for was not filled. So if I could. No one was teaching that course. Sorry? No one was teaching that course at the reconstituted university. I, I can't, I can't speak to that, Your Honor. All, all I know is that. That was in the pleadings somewhere. I, I. No, they do have a dietetics department at the new one. Yes. Yes, Your Honor. But the specific position that Dr. Edewamp applied for was not filled. I'm not sure if there's somebody else there teaching that. They hired, is it accurate to say they hired back 97% of the faculty from the, from the two institutions? That's, I, I mean, the, as, as far as the pleadings go, it's, it's correct that, that, that statement was made. I can't speak to the ultimate accuracy of. If he had, if he had timely applied, he would have been hired. Your Honor, I, I can't speak to that either. There are, there are, there are some other qualifications that speak to budgetary matters and, and things like that, that, that, which also just go to show that there Isn't that what the notice said though? The, the notice said that, that you will be recommended tenure to the Board of Regents if you meet these qualifications. But one of the qualifications is that UTGR, UTRGV has budgeted a sufficient number of faculty positions in that academic unit to grant tenure. And ultimately the, the position was not filled. I don't know whether the position was not filled because of budgetary reasons or, or something else. But there's, there are more qualifications than, than just you're in good standing. I mean, the, the State doesn't, doesn't say that he wouldn't have fulfilled those requirements. No, no, Your Honor. We do not. If I could, if I could take the Court back to first principles here. In order to have an entitlement that entitles you to due process, there must be a corresponding legal obligation imposed on the State. And what the Supreme Court and this Court has told us one looks for in a legal obligation imposed on, on the State, is number one, you're looking for something that, that is focused on an individual and not an entity regulated. And that contains unmistakable language that, that, that makes it clear that someone is guaranteed a benefit. Now, originally this Court pointed to the Social Security Disability Statute, which said if a person is under a disability, that person shall be entitled to disability benefits. And now if you look to SB 24, Section 5D, you'll find a similar thing in SB 24, where it says that students at UTPA and UTB are entitled to admission at UTRGV. And then if you, if you compare that to 5C, you can see that 5C is focused on the entity regulated, contains no, no guarantee for an individual. And as this Court knows, when, when a legislature uses different language in different parts of a statute, you presume different meanings. And the legislature knew how to create an entitlement. It chose not to, and that choice should be respected. If I can, I'll, I'll go on now to the affirmative defenses, because even if somehow you could find a property right here, each of the defendants that Dr. Edianwe has sued is immune from liability. Under, under sovereign immunity, Dr. Edianwe has sued organs of the state. He has sued the state. This is the classic sovereign immunity scenario. And as this Court held in Myers, just because the state removed, it does not lose its sovereign immunity from liability. So the, the declaratory judgment claim that Dr. Edianwe has brought against the State entities is, is barred. But you sent us this Rule 28J letter about the Weatherby case. Yes, Your Honor. Has the, has the State filed a motion for rehearing to the panel in the Weatherby case? I, I don't know whether or not the State has it, Your Honor. It was, it was dicta in the case, so I don't know if, if it's proper. Dicta has a way of getting, making things messy. It, it does, Your Honor, which, which was one of the reasons why, why, why. Why do you, right. Why don't you tell the panel that? Well, it's not, it's, it's, it's not my place, Your Honor. If the, if, if the State chooses to do that with, after consulting the client in, in that case. Well, let me just suggest that since the State is the interested party here, to have even an unpublished opinion saying that Ex parte Young extends to a State agency is just going to confuse people because not everybody is an expert in this area. Your Honor, I will, I will communicate that to my colleagues. If I could move on now to qualified immunity. The, each, each of the cases that Dr. Idiomwe cites to clearly establish his rights here speak only at a, at a 30,000 foot level of what it takes to create a property interest in employment. None, none applies to anything like the, the particular context here, which is what the Supreme Court has told us we need to find in order to have clearly established law. And so at the end of, at the end of all of this, even if you were to agree with everything that Dr. Idiomwe says about his property right, the, the dismissal by the district court was still correct. And if the court has no further questions, I will relinquish the balance of my time. All right. Thank you. Thank you. Thank you. If I might, I'd like to touch upon three things that I think are very important and one has not been discussed. It's page 147 of your record, which is page two of the hiring of the tenured and tenured track faculty member's document. And it states in paragraph G, UTRGV has budgeted a sufficient number of faculty positions in that academic unit to grant tenured appointments to all individuals in the corresponding UTB and UTPA academic units who qualify under section 4.1. It says all faculty members who qualify. He was a tenured faculty member. Filing an application is not a matter of qualification. He had the qualifications. He was not disqualified by virtue of the fact of any disciplinary action or being the target of any allegations at the time. So I would refer you to subparagraph G. But also in the frequently asked questions document, which is at page 152, it states eligible faculty members who meet the criteria in this phase will automatically, automatically receive a tenured or tenured track appointment. Let me ask you a question. Your fellow went to Nigeria in July or August? July, one week before the July 18 notice. You know, I would have thought that faculty members were taking a very intense and particularized interest in the ensuing hiring criteria for the merged universities. One would think so. Yes. And did he somehow not have access to the Internet during this four-week, critical four-week period? I think that may be the case, Your Honor. I don't know for certain, but Nigeria does not have the same ability to communicate that the United States does. I don't know that specifically. But again, that's an issue of fact, which under the Yates case we are entitled to plead under Rule 8e and we are entitled to develop because it says in two different places all individuals get appointments and it's automatic. You automatically receive. So I'm certain that Dr. Idiomwe wasn't concerned about whether or not he was going to get a tenured appointment because it was guaranteed. Well, the facts came out. I mean, the State says that the frequently asked questions didn't come out until after he had already left the country. That is correct. So he couldn't have relied on that. He did not. And they're trying to use the frequently asked questions against him because that had all the Phase I hiring requirements. I thought you were just citing the facts to us in support of his position. The July 18 Bulletin reiterates what is contained in the May Board of Regents, which has the effect of law. And the May one specifically invokes timeliness. It does not contain the time limits. It says that the individual shall comply with whatever time limits are required. It does not impose the time limits. It does not give you the roadmap. But here's the most interesting thing, is that under Mennonite Board of Missions v. Adams, you have to give actual notice, and that's a minimum constitutional protection. I consulted with my partner here. None of the other plaintiffs have notice issues. Every single one of them received notice and applied timely. So this is the only individual who did not receive notice that we represent who did not apply timely. And because he was qualified and it was automatic and it was guaranteed, he should have at least had an opportunity because he contacted them. The October 7 meeting, I clarified, was in person. He went in in person and said, what can I do to fix this situation? I understand this has been going on. And they said, oh, just don't worry about it. You can apply in Phase II. But Phase I hiring was not closed. Did he apply in Phase II? Yes, he did. And he didn't get hired? He did not get hired. And that's when the dean, Dean Lecter, said to him, you shouldn't even have to be here because you're a tenured faculty member. You should not even be here. You can't rely on what individuals say when they don't have that authority. I understand that, but that is suggestive of what he had a right to believe because it's a reasonable expectation of continued employment. If the dean who was involved in the hiring process believed he didn't have to apply, how much less could you charge Dr. Idionwe, who's in Nigeria, with knowledge of what the requirements were when Mennonite says you have to give him actual notice and that the publication, that in our position the publication of a document is not sufficient because the bulletin said you're going to be invited. Isn't there a faculty senate or something? There is a faculty senate. Wouldn't the faculty senate have been sending out notices to all faculty about, you know, the legislature abolished your tenured position. We are keeping you advised moment by moment of what is going to happen next. We have no knowledge that he received any information about that. But the other issue that Mr. LaFond mentioned is abolishment of the position. They did not abolish the dietetics department because there's UT Southwestern cases. There were cases that went up pertaining to the abolishment of a department. This is not one of those. They kept the dietetics department. His position continued to exist. They decided not to fill it, but the position still existed. And so in Phase I, our position is there was no discretion because he was guaranteed that he was entitled to receive a job. But more importantly, I'd like to... You have one more point. That's okay, but your red light is on. I'm sorry. Just that there's an abuse of discretion for the denial of leave to amend and that we were not allowed to put our best foot forward and plead the facts. Thank you very much for your time and attention. Okay. Thank you.